first and we'll hear from you. Thank you. Good morning. My name is John Nicoletti. I'm a member of Nicoletti Hornigan Swing and we represent the defendant appellant Kirby Ochoa Marine in this appeal. I will be referring to Kirby Ochoa as Kirby throughout the argument. Although there are many subsidiary issues underlying the trial judge's errors, the three main areas that we will focus upon as an overview will be the finding that Captain Rivera was not covered by the Law Enforcement Republicans Claims Act which I believe that Captain Rivera is what they call a Serachi seaman. The crucial distinction between the two statuses of seaman versus public worker is that a Serachi seaman is entitled to claim for the unseaworthiness of the vessel. In making such a claim, a seaman's liability must be taken into account. However, and as we contend is correct, if Captain Rivera is a harbor worker covered by the act, then in assessing the liability of Kirby or the non-liability of Captain Rivera, his own acts must be taken into account. The second critical error that the trial court made in the underlying decision, and one which is only reached if liability is found against Kirby, is the matter in which lost future earnings are to be calculated. This court has long followed the Culver II rule that the only lost earnings to be taken into account are those of the injured party himself. In the trial court's decision, we note that the earnings of Captain Rivera as an individual was not taken into account. Instead, the documents relied upon by the trial court in awarding future lost earnings was a particular K-1 partnership document issued by the Pilots Association to a corporation called Ivan Marine. If you examine that K-1, Ivan Marine is known as being the partner to the association. Captain Rivera created this particular business set up and entity in a way to account for his earnings and take certain tax advantages. Let me ask you a question. Let me ask you a question, because I think you anyway, it's undisputed that he was a pilot. You know, that's a term of art. It's an occupational, you know, place of art in the whole maritime, you know, landscape, etc, etc. So we know what your argument is in the brief in terms of him being an employee of his company versus independent contractor. Was there something unique about his set up as a pilot, quote unquote, vis-a-vis, you know, sort of that industry? There aren't a whole lot of pilots, you know, they're unique and all that. So to understand your argument better, was there something unique about the way that he set up? Meaning, you know, he has this company, subchapter, dot, dot, dot. Are you arguing that what he had is out of the norm for the way pilots normally do? So, you know, we should hone in here more. Just help me a little bit with that. I do not speak to all pilots, but it's not uncommon for pilots to create and work through a corporation for various and several reasons. One is to protect their personal assets from liability. Two is to take advantage of certain tax codes and regulations in the federal and state tax structures. The point being is that COVID does not permit taking into account the corporation's earnings when assessing future loss earnings as to the injured body himself, which in this case is Captain Rivera. There is in the record ample evidence that Captain Rivera, as an individual, did not earn all of the sums which were paid by the association to his corporation. Well, I don't want you to spend all your time on the earnings part, and your point is responsive, but I was asking my question not just solely to the calculation issue that you're asking, but coming all the way back to square one in your basic posture in terms of whether he's Siraki Seaman, covered by the act, et cetera. I was trying to go back to principle 101, i.e., he's a pilot, and whether you were arguing that his setup was somewhat unique in the sense of i.e., in terms of whether Siraki Seaman, whether covered by Longshoreman. I know that it's part of your argument in terms of the damage part, but that's what I was kind of trying to get you to help me with. I'll help you with that very easily. Some pilots do not operate through subchapter S or other types of corporate structures. Some act as truly members of the concern of the vessel itself. The most important cases to examine in the context of Your Honor's question is the original appeal in Bach and the Blanc case, both of which come out of this circuit. The Blanc case is a district court case. Bach had the unique opportunity to review a similar situation in the context of whether a pilot was a Siraki Seaman, or was he covered as a harbor worker under the act. Unfortunately, Bach did not have to make that decision because they found that under either theory of liability, Bach was not entitled to recover. And one of the main, in fact, the only reason I can determine why Bach did not come to a decision that the pilot was not, was a harbor worker versus a Siraki Seaman, was there was nothing in the record in Bach to demonstrate his employment status. That is not the situation before this panel. In this case, we clearly have an employer. It is Ryben Moraine, in this case, we specifically have an employee, and that is Captain Rivera. Using the definitions provided by the act itself, 33 U.S. Code 902, there's no doubt that the act, by definition, covers an employee who is engaged in maritime employment. There is no doubt that Captain Rivera was engaged in maritime employment. He was the navigator. He was a pilot. Further, there is no question that he was injured on navigable waters. I would suggest to the court sufficient to find he's covered by the act. However, in recognition of the Bach decision, this court has inferred that there's a further requirement involving pilots, and that is whether or not they're in employment. We don't have that question here. There's no doubt he was, if he had an employer, Ryben Moraine. Accordingly, there should be no doubt that under the facts of this case, Captain Rivera is a harbor worker covered by the act. Counsel, let me make sure I understand where that argument takes you. You cited some cases like Preston Bach, which was unpublished, which relies on Manuel, which is a published opinion dealing with independent contractors. The distinction, it seems to me, you are making is that we go one way if someone like this pilot is operating in a corporate or employment status with his own company where he's a sole employee, sole owner, whatever it is. But so long as he's not acting as an individual, we get one result. If he does operate under some sort of business status as an employee, at least for tax purposes or otherwise, we get a different answer. Is that your position? That is the narrow position this court can take if it doesn't wish to find pilots in general to be covered by the act. In the Harwood case, which is a Fourth Circuit case, which we cited in our brief, they did not use that distinction at all. They came to the conclusion that since pilots are not Jones Act semen, they fell within the act, whether he was an independent sole proprietorship or acted through a corporation. The Ninth Circuit has also pretty much abolished the Serafin semen doctrine. But I'm not asking the court to go that far. It does not have to go that far in this case. The act is clear. Injured on navigable waters, performing a And lastly, as inferred from Bach, that he has to have an employee. We satisfy all three requirements in this matter. And if this court doesn't wish to go as far as the Fourth Circuit and the Ninth, it can limit this opinion to that particular status, that he is an employee of an I guess he falls on a 905 B. Is that the way his his employment or his liability of your client would be analyzed? And if so, what do we do after agreeing with you as to his status? Well, unfortunately, that in the underlying case, the liability found by the trial judge was limited to only one of the three duties covered over the act. Under Cynthia Shippen, the vessel owner owns to a harbor worker or a longshoreman three distinct duties. One is called the turnover duty. That covers the ingress and egress of the harbor worker or longshoreman to and from the area in which he's going to perform his function. The second duty is the active control duty. But that only applies once the harbor worker has instituted and commenced his operations aboard the vessel. In this case, Captain Rivera was injured during his ingress. He admits in his testimony that he had not yet taken control of the vessel and did not as yet, in the sense of his piloting, and did not as yet commence his operation. Therefore, the underlying decision by the currently liable was under the active control duty, which is inapplicable in this case. The proper analysis shouldn't be made under the turnover duty. That is the ingress and egress from the vessel. Unfortunately, and for reasons unbeknownst to myself, in the pretrial order, Captain Rivera would have waived his duty. And that's under ROA 536 as part of the pretrial order. So at the very least, this court, as I am arguing, if they find Captain Rivera to be covered by the act, must reverse the liability decision because the duty which was explored was an incorrect duty and inapplicable to the present situation and the injury complained of. Further, once we turn to the act, the act recognizes that Captain Rivera's contributory negligence should have been taken into account when assessing Kirby's culpability and Captain Rivera's ability to collect full damages. Is that your sunglasses argument? That is the sunglass argument, but it's more than a sunglass argument. They didn't take into the court. The court found summary and concluded that Captain Rivera was not contributory negligent. That is not sufficient for this court to uphold that finding. So you wanted him to write 20 pages to say he wasn't contributory negligent because he had sunglasses on, coming out the sun, off the water, into the deck. So the district court said no contributory negligence. So he didn't write 10 pages to explain why. And you say because he only said that, that's reversible error. Is that your point? If you follow the, yes, if you follow the federal rules of civil procedure. I'm just asking you if that's your point. I mean, it was a bench tried case. The judge sat there. I'm not giving you my idea whether you're right or not, but to me it's a little much. It's a bench tried case. You make this argument, you know, and the other side says the guy's coming in out the sun and, you know, he's got glasses on it. And you say contributory negligence because he doesn't take the glasses off. And the judge says no. So he doesn't spend 10 pages saying that. And you want us to hold it because he doesn't explicitly explain why he didn't think that was contributory negligence, that we ought to reverse on that point. I just asked you if that was your point. I think you just told me it is, right? That's my point. And the reason it's my point, this court has long recognized that if the trial judge does not comply with federal rules of civil proceedings... But we don't tell judges how much to write. Come on, Mr. Nicoletti. I'm not saying your argument may end up having some traction, but you're not going to find no cases where we say, you know, you got to write six pages on this and eight pages on this. It's a bench tried case. This is not summary judgment. It's not 12B6. But I mean, we got your argument. I just want to make sure I was clear. I'm sure my colleagues are. I just want to make sure I was clear that that's your sunglasses argument. You may well prevail. I don't know, but I want to make sure I wasn't missing anything. Yeah, but I do want to at least advise the court that based upon your own case precedent, the reason you'd want to have more specific findings is to allow the bench and to allow the appellate to demonstrate that the judge had made a clearly erroneous finding. I understand the reason for the rule. And I got your point. But I also understand it's a bench tried case with witnesses. It's not summary judgment on the papers. And it's not pleadings. It's a trial with witnesses on the stand. Did you try the case? No, I did not. All right. Well, anyway, I got your point on the sunglasses. As I said, you may well prevail. I just want to make sure I understood that you that it was the sunglasses argument, principally not some other business, you know, in terms of him being escorted, etc. and all of that. So you've saved your rebuttal time and have a chance to come back. All right, let's hear from Ms. Yates. Thank you. Thank you. Thank you, Your Honors. Your Honors, the district court judgment can be affirmed here, regardless of whether Captain Rivera is a Serachi seaman or whether instead he's covered by the Longshore Act, because the district court, Judge Hanks, with great foresight, made liability fact findings both ways. And on Seaworth in his claim for Captain Rivera, if he's a Serachi seaman and a 905B negligence claim fact findings, if instead Captain Rivera is covered by the Longshore Act and is not a Serachi seaman. Now, Judge Southwick's question's exactly right. That's the line of demarcation that counsel asked us to draw here, that the harbor pilot, because he's a self-employed independent contractor, cannot be covered, and must instead be covered by the Longshore Act. But in the Bok case, this court held that harbor pilot, in that case it was a river pilot, who was a self-employed independent contractor, could be a Serachi seaman, because not being the employee of anyone other than himself, the river pilot would not, according to Bok, fit within the Longshore Act's definition of employee as any person engaged in maritime employment. But then, 16 years later, in an unpublished opinion in Preston Bok, this court held that the self-employed maritime worker, who was not the employee of anyone other than himself, was covered by the Longshore Act for 905B negligence and was not a Serachi seaman. Now, of course, Preston Bok- Ms. Yates, let me ask you something about that. Your point in your brief was, caught my attention, and the response to it, Mr. Nicoletti did as well. It did rely on the Emanuel case, in which it was an employee of some sort of sandblasting and painting firm, so the person injured was one of several employees, thousands to, I don't know how many, but he was a more traditional employee. Right. But Preston Bok, best I can tell, did not involve that. He was a single employee of himself. It seems to me the unpublished opinion may well have gone, it certainly went beyond Emanuel, and you keep coming back, it doesn't really matter, you win no matter what we do. But isn't that a fair distinction between Preston Bok, and we don't really have a precedent in this court where somebody who is an employee of himself, a precedent, not just an opinion, employee of himself is covered under Seraki? That's exactly right, Your Honor, that's exactly right, and that's why the district court started out holding that Captain Rivera is a Seraki scene and under Bok, because Bok is precedential, and that's why he's so held. But then the district judge went on to say, you know, he also made findings under 905B. And note that counsel, Mr. Nicoletti is correct, that the Ninth Circuit in Gotra held that the self-employed marine surveyor falls within the employee definition of the Longshore Act, because that definition does not require a separate employer. And the Fourth Circuit in Harwood, after recognizing that the harbor pilot was an independent contractor, self-employed, held that the harbor pilot was not a Seraki seaman, but instead was a covered for 905B by the Longshore. So that's where you are. You have the Bok decision from this circuit, which is precedential. Preston Bok is not precedential. And Bok does say, counsel's right, Bok does say the record before us does not clearly reveal whether Bok was a Longshore covered worker. So presumably, you could follow Bok and say he's a Seraki seaman. And if you do, your honors, counsel, Kirby is not even challenging on appeal the district court's fact finding that the vessels on Seaworthy has caused Captain Rivera's injuries. And if instead you think he's a 905B Longshore covered, then they don't challenge the underlying fact findings of the district court that Kirby knew or should have known of this hard-to-see Fogel Sanger testified that no, he had seen no other vessel that had a hatch cover at that location. So the hard-to-see... Let me ask you, let me ask you two things about what you just said. One is a very simple question about GOTRA, which does not discuss, at least in my word search and my perusing of it, doesn't discuss Seraki. I wonder if the Ninth Circuit as a circuit has not recognized that that case has survived the amendments to the Longshoreman Act, or do you know? Yes, your honor. I believe if you'll check, I think GOTRA does say he's not a... I'm trying to pull the case. I think GOTRA does say he's not a Seraki seaman. It definitely discusses that... I searched for the word Seraki and it didn't come up. So regardless, that could be my mistake. The second question, excuse me, you're saying there's not very much you have to cover. I'm not trying to cut you off, but just want to make sure where your argument takes you. You really don't have much to cover other than to support that under all these different theories of liability, you win, and you have to support that the evidence is there to show that you win. My preliminary question is, are you saying under 905B, Seraki, Longshoreman Act generally, wherever that might be involved other than 905, it's the same causation that we're looking at the same defenses, at least insofar as relevant as this case, which is only contributory negligence, I suppose. What is the distinction generally between those two liability schemes? Okay, your honor, the truth is there's very little because while contributory negligence does apply to 905B, comparative fault applies to an unseaborn claim if he's a Seraki seaman. I'm a little bit buffaloed as to why counsel thinks it's such a great thing if he can put him under 905B as opposed to unseaworthiness because it lands about the same place other than Kirby's argument about the duties under 905B, the active control duty versus the turnover duty. See, this is how they want to argue. This is what they're saying. They're saying, oh, it can't be active control duty because he had just gotten on the vessel and was walking to his workstation when he was injured, so his operations, quote, had not yet begun, and so it can't be active control duty. And then they say, oh, and you waived turnover duty in the pretrial order. So that's how they want to win the case. There's just no duty, according to them. But the active control duty under this court's Theriault decision, which was written by Judge King, this Theriault decision applied the active control duty to a maritime worker covered by the Longshore Act who had just boarded the vessel and was walking to his workstation when he slipped on a dangerous condition on the deck. So Theriault applied the syndia duties, the U.S. Supreme Court syndia duties for the longshoreman, which today would be labeled turnover, and it also applied the active control duty. So we believe that Kirby's argument that you can't apply the active control duty because his operations had not yet begun is legally incorrect. And in line with Theriault, we would say that the longshoreman's operations have begun once he boards the vessel and is making his way to his workstation. But even if you thought the active control duty somehow didn't apply, look at the pretrial order. He's right that we used the label active control duty and we didn't use the label turnover duty. But the duties that we're talking about, as for example, the duty to warn, the district court found that Kirby breached the duty to warn. Why? Because they didn't have a valid escort who would have warned Captain Rivera of the hidden hard-to-see hatch cover hazard. The duty to warn, as the court wrote in Theriault, is a duty to, and I'm quoting Theriault, the shipowner under syndia has a duty to warn the maritime worker of hidden dangers at the outset. That's the turnover duty. So even if we didn't use the label turnover duty, the duties that we pointed to, the breaches that we pointed to, would be appropriately under that label. And it would make no difference in how you tried the case as to whether you labeled it the active control duty or you labeled it the turnover duty. So we believe that we did. We have ample evidence to support Judge Hanks's fact findings under the turnover duty and the active control duty. And therefore, Judge Southwick, you're exactly right. It really shouldn't make that much difference which way you jump as far as the status issue. But let me cover, if I could please, his contributory negligence argument or what might be called comparative fault if he, if Captain Rivera is a Serachi seaman. Okay, Kirby's own Commander Martin, who was one of their experts, testified that while this oddly located hatch cover itself is visible, he said he could not discern the change in elevation created by the hatch cover. And it's the change in elevation which was three times more greater change than materials said would constitute a tripping hazard. It's the change in elevation that creates the hazard. And yet their own experts said he couldn't, he couldn't see the change in elevation just looking right at the hatch cover. This is why the sunglasses argument doesn't work. And as far as no subsidiary fact findings like the tributary negligence, Judge Hanks connected in one sentence the statement that the hazard was not open and obvious with the statement that there's no contributory negligence. So in effect, what is he saying? Even if Captain Rivera had taken his sunglasses off, he wouldn't have seen the change in elevation because the hazard was not open and obvious. In fact, when Captain Martin, Commander Martin, their experts said I couldn't see the change in elevation, the district judge stopped and said, okay, to Kirby's counsel, I want to confirm that that's what your expert said. Because the district judge thought that was an contributory negligence. Another subsidiary fact finding is Judge Hanks' finding that the hatch cover was oddly located, oddly located. So Captain Rivera should not have anticipated that when he stepped into the interior space, his very first step, he's going to land on this hatch cover. Remember their own Captain Vogelsanger had seen no other vessel with a hatch cover at that location. So the district judge's refusal to find contributory negligence is not clearly erroneous. Now, I'd like to turn to the damages questions, unless your honors have more questions on status or active control duty or the other 905B issues. But turning to the damages. The question I have about, I have a question about the facts, Ms. Yates, and can't see how it would affect the outcome, but just to make sure I understand this case. As your client comes aboard, his escort sort of gets away from him for probably legitimate and reasonable reasons, but it was unfortunate. Does Captain Rivera go in the door that he would have gone in if he stayed linked up with this escort? Or was he entering at this oddly placed hatch cover when he stepped in, which is not the entrance he would have entered otherwise? It's that he entered the exact same way he would have entered if he hadn't lost the escort. The reason he lost the escort is the escort, able-bodied Seaman Hudgens, was going too fast. And Captain Rivera- I understand. I'm just asking if he used a different door. That's all I want to know. You can now move on. It's the principal entrance to the house, the house, which is what you call the interior of the ship. He took the principal entrance. So there should be no issue on that as far as contributory negligence. Now, due to his injuries caused by Kirby's negligence, Captain Rivera could not pass his harbor pilot's physical, even though he passed it 15 times before. He couldn't pass it because he has chronic pain syndrome, which requires him to take all this medicine, which means he's not as alert as he should be and he can't move around as much as he used to. So due to his injuries, he couldn't pass the physical and loses his harbor pilot's The district court found economic damages for Captain Rivera's lost earnings as a harbor pilot and Captain Rivera's lost pension benefits as a harbor pilot, and Kirby is not complaining about the award for lost pension benefits. As to the lost earnings, Kirby complains about our expert and the district court's use of K-1s that are provided by the Harbor Pilots Association to Captain Rivera's Subchapter S corporation, Ribbon Marine. Now, the district court used those K-1s and our expert used them because the K-1s from the Harbor Pilots Association contain only his earnings as a harbor pilot, and we weren't trying to recover for his lost earnings from his other lines of business that are reflected on the Subchapter S's tax return and his personal tax The other lines of business that Captain Rivera had are his expert witness work and his charter boat servicing business, and the standard of review with respect to their complaints about the damages is plain error because in the district court, when Kirby made specific objections to our expert's testimony, Kirby made no objection to the use of the K-1s. That's the record at page 1862, 1910 to 26, and Kirby's pre-trial complaint about the K-1s was limited to a plain, vanilla, irrelevant hearsay. That's all they said. Now, their own expert got on the stand and disagreed with our expert's use of the K-1s, but Judge Hanks expressly found our expert, Mr. Cliff, was credible, and this court has said in Dunbar Medical and other cases that it's even fact findings where the fact finding is tied up with the judge's determination on credibility. Kirby says our expert and the district court did not use a big enough number when we were subtracting for the business expenses related to Captain Rivera's harbor pilot work, but again, the standard of review is plain error because in the district court, when Kirby made specific objections to our expert's calculation, Kirby made no objection to our expert's use of $20,000 a year to estimate Captain Rivera's annual average business expense for the harbor pilot, and Captain Rivera's accountant, Ms. Mata, who happens to also be the accountant for the Harbor Pilots Association, testified that $20,000 a year is a good estimate for annual average harbor pilot expenses. So, on the one hand, we have our expert's testimony the judge says was credible and our accountant's testimony who says this is a good number to subtract, and against that, what does Kirby bring this court to argue that you should say that evidence is not sufficient to support Judge Hanks' fact finding? Kirby points to business expense deductions on the subchapter S tax return for a recreation vehicle, but Ms. Mata testified at page 5447 that Captain Rivera used the recreation vehicle as a mobile office for his expert witness work. Kirby points to interest expense deductions on the subchapter S tax return, but Kirby made no record to bring to this court for its appellate complaint because Ms. Mata said at 5447 that only some unidentified part of that interest expense relates to Captain Rivera's work as a harbor pilot. Similarly, for the other expense deduction on the subchapter S return, Kirby again made no record because Ms. Mata said at 5448 that only some unidentified part of those other expenses related to Captain Rivera's work as a harbor pilot. So, they didn't make a record to come to this court and say, oh, Judge Hanks' findings are not supported by sufficient evidence just because he thought that Captain Rivera's expert, Mr. Cliff, was credible and just because they had the account in this matter, that's not good enough. They didn't make a record to bring that kind of complaint to this court. Now, Kirby is unhappy about the amount of economic damages that Judge Hanks found, but the size of the damages is driven by the fact that harbor pilots make a lot of money, and they make a lot of money because they have a special expertise and their earnings are based on maritime activity in the harbors in which they work. And Captain Rivera was only 39 years old when, due to Kirby's negligence, he lost his harbor pilot's license. And on appeal, Kirby does not challenge the district court's fact-finding that Captain Rivera would have worked as a harbor pilot until he was 68 years old. Their damages numbers that they throw around in their brief, look at the footnotes. They drop a footnote and say, well, you know, our expert, he didn't calculate damages for those last five years, so you'll have to remand so our expert can do a new calculation. I mean, they knew we were claiming life expectancy to 68 years old because that, for three of the five harbors in Texas, that's the mandatory retirement age is 68. The other two harbors don't have a mandatory retirement age. So, even though Captain Rivera asked the district court to make fact findings on non-economic damages like pain and suffering, and check out all the fact findings where Judge Hanks said repeatedly the pain that Captain Rivera was in and is in, but the judge made no fact findings, awarded no money for non-economic damages, even though Captain Rivera was clearly entitled to some. But we're not complaining about that on appeal. All we're asking the court to do is affirm whichever status you think is appropriate, Ceraki-Seaman or Longshore Harbor Worker Compensation Act. We believe that this judgment, after this seven-day bench trial, should be affirmed. And if your honors have any other questions, I'm happy to answer them. All right, thank you, Ms. Yates. I believe we have your argument on all the issues. All right, Mr. Nicoletti, you have repositioned yourself for a rebuttal. Literally and figuratively, you have positioned yourself, so you are ready to launch. But you got to get off mute, though. I believe we're all off mute. All right, go ahead. Yeah, go ahead. As I said, I didn't want you to get any disrespect from arguing for the seated position. The first thing I want to point out are certain mistakes made in the opposing argument. Captain Rivera's counsel argues that our safety actor, Commander Martin, stated you could not see the differential in elevation. That is absolutely incorrect. Commander Martin specifically stated that if you looked at the plate and the deck, you could see a differential in elevation. The only thing he said was you could not tell whether it was one inch, one and a half inch, or three-eighths of an inch. But the fact that Captain Rivera should have observed the differential, should have alerted him that it was an uneven surface, and that he should take the appropriate precautions when stepping down. Why couldn't he take that precaution? Because he couldn't observe it with the sunglasses on. The second issue I want to raise is that comparative negligence in a maritime case, vis-a-vis unseaworthiness, is not a document that's always put into place or utilized by the court. And in this case, Judge Hanks did not address that issue whatsoever in his decision. He only focused on alleged contributory negligence in the context of the 905B claim. In answer to the panel's question as to what the Ninth Circuit, the Ninth Circuit, as of 1981, in Normite v. Baratide, actually found that the 72 amendments to the Longshore Mahapaluka Claims Act abolished the Suraki rule in its entirety. You know, uniformity is important in maritime cases. And I have the utmost respect for the Fifth Circuit as one of the leading maritime jurisdictions and courts. But I believe we need to have uniformity throughout the states. The Ninth Circuit and the Fourth Circuit have specifically found that pilots fall within the Act, particularly the Fourth Circuit. And I believe the Fifth Circuit should follow that rule with or without employment, although we showed employment in this case. Further, the Bak-1 decision is very clear. They don't find in that case whether he was a Suraki seaman or a longshoreman or harbor worker under the Act, because they had no information about a pilot's employment. You can't read that case any other way than that the Fifth Circuit developed a third leg to the test of the application of the Act, which is, was the pilot employed by a third-party entity? And if they had found so, you can follow from their analytics, that the Bak pilot would have been found to be covered under the Act. Those are the most important issues that I thought needed to be clarified in this response. As far as damages, you can't run away from the law or the facts. The underlying decision by the and also used inconsistent lifetime. He gave him only 62 years for outside income, but 68 as a pilot. Pilots are much more strenuous activities. That's a big differential. And all of the expenses that were outlined in his accountant's own testimony shows that they should have been subtracted from the base wage in his W-2 and K-1 from $20,000 in expenses. Overall, the judgment against Kirby must be reversed for no other reason than the judge applied an incorrect duty in assessing that liability. Whether or not they waived the turnover duty, I believe they have based upon the pre-trial order, but that's something for this court or the trial judge to assess in the future. But you cannot affirm this decision based on an incorrect legal standard. There was no violation by Kirby of the act of control of duty. That all required to reverse. Thank you, Your Honor. All right. Thank you, Mr. Nicoletti. Thank you, Ms. Yates, for a robust briefing and arguments. This concludes the four cases that we had for oral argument today. The two of you are excused with the thanks of the court. Thank you, Your Honor. Thank you, Your Honor.